### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

PHI HEALTH, LLC,

    *Plaintiff,*

  v.

OPTIMUM CHOICE, INC. D/B/A/
UNITED HEALTHCARE,

    *Defendant*

Case No. 25-cv-2320-ABA

### MEMORANDUM OPINION

In 2020, Congress enacted the No Surprises Act ("the Act" or "NSA") in response to concerns that too many patients were receiving unexpectedly high medical bills from out-of-network providers, particularly for emergency medical services. In pertinent part, the Act (a) capped the prices that out-of-network medical providers such as Plaintiff PHI Health ("PHI"), an air ambulance provider, could charge, (b) prohibited such providers from collecting (or even seeking) any payment from the patients they served, and (c) extinguished any common-law rights that such providers otherwise had to be paid for the services they provided. Having limited their rates and rights, in exchange Congress, among other things, (a) set up an Independent Dispute Resolution ("IDR") process overseen by the U.S. Department of Health and Human Services to resolve disputes over payments for such out-of-network emergency services and (b) required health benefit administrators (such as Defendant Optimum Choice Inc. ("Optimum")) to pay any resulting amounts due within 30 days of the conclusion of an IDR dispute.

In this case, PHI provided emergency air ambulance transport services to a patient covered by one of Optimum's health plans. There is no dispute that the patient's plan covers out-of-network emergency services. Optimum disputed the amount of the

charge, as it was entitled to do. The IDR procedure ended with a ruling in PHI's favor. Under the Act, that IDR award is "binding" (in the absence of "a fraudulent claim or evidence of misrepresentation of facts," which Defendant does not contend is relevant here), and "payment . . . shall be made" within 30 days. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I) & (c)(6). Defendant has not paid; so Plaintiff has filed this case to enforce the IDR award. Optimum has moved to dismiss, arguing that even though the Act expressly requires it to pay, this Court lacks authority to order it to do so. For the following reasons, the motion to dismiss will be denied.

## I.    BACKGROUND

When a member or beneficiary of a health benefit plan finds herself in need of emergency medical services, such as an ambulance or in a hospital's emergency department, federal law generally requires the insurer to "cover" those services (a) "without the need for any prior authorization determination" and (b) without regard to "whether the health care provider furnishing such services is a participating provider with respect to such services." 42 U.S.C. § 300gg-19a(b)(1)(A)–(B).[1] If the provider happens to be a "participating provider" with the patient's health plan—*i.e.*, within the "network of providers and health care facilities (participating providers or preferred providers) who agree by contract to accept a specific amount for their services," Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36,874 (July 13,

---

[1] Portions of the No Surprises Act are codified in Title 42 (Public Health & Welfare) and some in Title 29 (Labor), depending, as Optimum puts it, on whether a patient's benefit plan is an "employer group-sponsored, ERISA plan[]" or a "plan under the Affordable Care Act's Exchange." ECF No. 19 at 7 n.2. The parties here agree that the same analysis applies regardless of which codification applies. Where statutory provisions that are pertinent to the parties' dispute here appear in both Titles, the Court herein will generally be citing to the provision as codified in Title 42.

2021) (to be codified at 45 C.F.R. Pts. 144, 147, 149, 156)—the network agreement between the provider and the insurer generally would govern how much the provider is paid for the service.[2]

But in health emergencies things don't always align that nicely. The present case is one example. At some point in 2024, the patient whose treatment is at issue needed "emergency air ambulance transport services." ECF No. 4 ¶ 5.[3] The patient's identity is not in the record, and the patient is not a party to this case. That is by Congress's design per the No Surprises Act. Congress sought "to protect patients from surprise medical bills incurred when they receive emergency medical services from out-of-network healthcare providers." *Guardian Flight, L.L.C. v. Health Care Service Corporation*, 140 F.4th 271, 273 (5th Cir. 2025) ("*Guardian v. HCSC*"). Congress also sought to eliminate the burden on such patients of being caught in the middle of payment disputes between plan administrators (such as Optimum here) and emergency providers (such as PHI here). The patient here had health benefit coverage under a plan administered by Optimum. ECF No. 4 ¶¶ 5–6. The air ambulance that was dispatched to transport the patient was with PHI. PHI is not one of Optimum's "participating providers."

---

[2] The Act also applies to some non-emergency medical services provided by out-of-network providers at certain in-network healthcare facilities. 42 U.S.C. § 300gg-132. That section is not implicated by PHI's claim in this case, and thus this Court need not and does not decide whether the analysis herein would apply in that context.

[3] Because the case is at the pleadings stage and Optimum has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

Nonetheless, Optimum is required to cover the service, 42 U.S.C. § 300gg–19a(b)(1); that is undisputed here.[4]

But the fact that Optimum must "cover" the service does not define how much PHI may charge and how much Optimum must pay for the service. After providing the emergency transportation to the patient, PHI sent an invoice to Optimum for the services, for two procedure codes and a total billed amount of $41,939.89. ECF No. 4 ¶¶ 6, 13. Optimum took the position that $10,458.96 was the amount to which PHI was entitled and paid only that amount. *Id.* ¶¶ 6, 13; ECF No. 1-2 at 13–14.[5] The No Surprises Act adopts a formula for identifying the applicable "out-of-network rate" for a given out-of-network "emergency service," including by reference to "qualifying payment amounts . . . for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region." 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). The record does not indicate the basis for either PHI's billed amount or Optimum's payment amount.

That is where the next relevant components of the Act come into play. Congress understood that imposing caps on what insurers would have to pay out-of-network emergency medical providers, while simultaneously prohibiting providers from billing

---

[4] A payor like Optimum would not *automatically* have been obligated to pay; there are certain prerequisites, which Optimum refers to as eligibility requirements, such as most basically that the patient had health benefits administered by Optimum. Here, there is no dispute that all eligibility requirements were satisfied and the patient was entitled to coverage by Optimum (and thus PHI was entitled to be paid by Optimum).

[5] Citations to page numbers refer to CM/ECF pagination for this and the other filings, which may not align with a document's original page numbering.

patients for amounts not paid by insurance, was a recipe for disputes between providers and insurers over payment. So, Congress did the following.

First, Congress created the IDR procedure. The relevant details are described in greater detail below. In a nutshell, the provider and insurer must first negotiate and attempt to agree on a rate; if they cannot agree, the dispute is referred to a certified IDR entity; and in a process akin to "baseball-style arbitration" (an analogy elaborated on below), the IDR entity adjudicates the disputes and determines which rate applies to the claim. 42 U.S.C. § 300gg-111(c).

Second, Congress mandated that once that process ends, the "determination of [the] certified IDR entity . . . *shall be binding upon the parties involved*, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." *Id*. § 300gg-111(c)(5)(E)(i)(I) (emphasis added). And because that determination (in the absence of fraud) is legally "binding," "payment . . . shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id*. § 300gg-111(c)(6).

Here, because there was a dispute over the amount that Optimum owes PHI for the claim, PHI initiated IDR proceedings on March 4, 2024. ECF No. 4 ¶ 12. The next month, the IDR entity that was assigned to adjudicate the dispute, ProPeer Resources, LLC, issued a written payment determination notice, including an "IDR Award." *Id*. ¶ 13. The IDR Entity began the written order by stating that "only one party, PHI Health, LLC, submitted an offer." ECF No. 1-1 at 15; *see also id*. ("ProPeer Resources, LLC did not receive an offer and/or fees from UHC Optimum Choice."). On that basis, the IDR Entity "found in favor of PHI Health, LLC" and "determined that the out-of-network payment amount of $41,939.89 offered by PHI Health, LLC is the appropriate out-of-

network rate for the service." *Id.* The IDR Award stated that, consistent with the Act, the amount due "must be paid [to PHI Health] **not later than 30 calendar days** after the date of this notification." *Id.* (emphasis in original).[6]

Optimum refused to pay any amount beyond its earlier payment. Over a year went by. PHI filed this lawsuit in the Circuit Court for Howard County on May 27, 2025. ECF No. 4 at 1.[7] The complaint contains two counts. Count 1, entitled "Petition to Confirm Arbitration Award," contends that "[t]he IDR Award should be confirmed by judgment of this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 9" and thus a money judgment should issue for the unpaid portion of the IDR Award, namely $31,480.93. *Id.* ¶¶ 15–19. The statutory reference is to § 9 of the Federal Arbitration Act ("FAA"), which in certain circumstances (discussed below) authorizes district courts to issue orders "confirming" awards issued in arbitration or certain other proceedings. *See* 5 U.S.C. §§ 572(a) & 580(c) (Administrative Dispute Resolution Act, authorizing agencies to use "a dispute resolution proceeding for the resolution of an issue in

---

[6] Optimum contends that the basis for ProPeer's determination was factually incorrect, because Optimum actually *had* submitted an "offer." ECF No. 19 at 7 n.2. That question appears to be one the parties dispute, and Optimum states that it filed a complaint with HHS about that alleged mistake. But Optimum has not filed an action or motion to vacate the award, as the Act undisputedly authorizes it to do, 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II), and at the hearing on the present motion it expressly disclaimed any contention that the IDR award was the product of fraud. And in any event, Optimum has filed its motion to dismiss under Rule 12(b)(6), *see* ECF No. 12 at 1, which means for present purposes the Court must assume the truth of PHI's allegations in the complaint and the facts set forth in the documents incorporated therein. Accordingly, the Court assumes for purposes of the present motion, as it must under the Rule 12(b)(6) standard, that PHI was the only party to participate in the IDR process.

[7] The precise date of the IDR Award does not appear to be in the record, but the parties agree that more than 30 days passed between the IDR award and PHI filing this lawsuit.

6

controversy that relates to an administrative program" and authorizing such final awards to be "enforced pursuant to sections 9 through 13 of title 9"). Count 2 is entitled "Implied Cause of Action Under NSA" and contends that because the Act "requires Defendant to make the 'payment required . . . directly to [PHI] not later than 30 days after the date on which such determination is made' by the IDR entity" and thus "requires Defendant to pay PHI the IDR Award Balance Owed for the transport at issue in this case," the Act itself "includes an implied right of action against Defendant for the amount owed to PHI." *Id.* ¶¶ 21–23 (citations omitted).

Optimum filed a notice of removal to this Court. ECF No. 1. It stated that the case "is removable to federal court because Plaintiff's claims in the Complaint arise entirely under federal law." *Id.* ¶ 8. It then filed a motion to dismiss, arguing that, although federal courts have jurisdiction to "vacate" an IDR award, they lack jurisdiction to "enforce[] and/or confirm[]" an IDR award and that PHI otherwise has no right to seek relief in court against Optimum for Optimum's failure to pay the amount due under the IDR Award. ECF No. 12-1. PHI filed an opposition brief, ECF No. 17, and Optimum filed a reply brief, ECF No. 19. Optimum has filed several motions for leave to file "supplemental authority," identifying decisions by other courts where providers have challenged other failures to pay amounts due under IDR Awards. ECF Nos. 20, 23, 37, 42, 43. PHI filed responses to some of those filings, ECF Nos. 21, 26, 39, and Optimum filed replies, ECF Nos. 22, 28, 41. The Court held a hearing on Optimum's motion to dismiss on March 3, 2026.

## II.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that,

even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and state a facially plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering such a motion, a court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

## III.   DISCUSSION

As alleged in PHI's complaint, and as Optimum does not dispute at least at the pleadings stage, PHI provided air ambulance services to a member or beneficiary of a health plan administered by Optimum; the treatment was eligible for coverage by Optimum; PHI is not an Optimum participating provider; PHI billed Optimum and Optimum took issue with the amount of the bill; PHI initiated IDR proceedings, which concluded with an IDR award in PHI's favor for $31,480.93 (the total amount awarded minus the amount Optimum had already paid). ECF No. 4 ¶¶ 5–7, 12–14.

Based on those alleged facts, and given that Optimum does not contend the claim was "fraudulent" or that there was any "misrepresentation of facts presented to the IDR entity," the No Surprises Act (a) establishes that the IDR award is "binding upon all the parties involved" and (b) imposed a deadline that has long since passed by which "payment" was required to be "made directly to [PHI]." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I), (c)(6). Based on the plain language of the Act, and the fact that

Optimum has not invoked its right to seek an order vacating the award, PHI has a legal entitlement to be paid by Optimum for the remainder of the IDR award.

But the question remains whether PHI has a right to seek an order confirming or enforcing the IDR award that was issued in its favor. PHI contends that it does, for two independent reasons. The first is that when Congress enacted the No Surprises Act it intended for a provider who obtains a favorable IDR award to have a right to enforce the award and convert it to a judgment if the payor who is obligated to pay fails to do so, *i.e.*, a private right of action under the NSA itself. ECF No. 4 ¶¶ 20–24 (Count 2); ECF No. 17 at 9–10, 12–14. Second, PHI contends that because an IDR award is akin to an arbitration award, and because the Federal Arbitration Act independently authorizes a party who has secured a favorable arbitration award to "apply to [a] court . . . for an order confirming the award," upon which "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]," 9 U.S.C. § 9, the FAA itself authorizes PHI to have pursued the present action. ECF No. 4 ¶¶ 15–19 (Count 1); ECF No. 17 at 10–14.

Optimum argues that neither statute entitles PHI to enforce the IDR award because (1) the No Surprises Act "does not include an *express* private right of action to confirm or enforce an IDR award"; (2) the NSA provides that an IDR award "shall not be subject to judicial review, except in a case described in [9 U.S.C. §§ 10(a)(1)–(4)]," which are the sections of the FAA authorizing orders "vacating" arbitration awards, 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); and (3) "in place of judicial review, the NSA delegates enforcement to HHS." ECF No. 12-1 at 13–17 (emphasis added).

The federal government's position is that "[t]he NSA's text, structure, purpose, and history support judicial enforcement of the payment determinations," and "[t]he

IDR process would make little sense if the parties to a [certified IDR entity's] payment determination lacked a means for judicial enforcement." *Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellants* at 6, *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271 (5th Cir. 2025) (No. 24-10561), 2024 WL 4451970 ("*Gov't Amicus Br.*"), at *6; ECF No. 17-3 at 16–17. The Fourth Circuit has not addressed the question, and as far as this Court is aware no other district court in the Fourth Circuit has addressed it either. The only Court of Appeals to have decided this question thus far, the Fifth Circuit, has concluded that, Congress did not intend for providers to be able to enforce or confirm IDR awards in court. *Guardian v. HCSC*, 140 F.4th at 274–77. District courts in other circuits have split on this question. *Compare, e.g., Guardian Flight LLC v. Aetna Life Ins. Co.*, 789 F. Supp. 3d 214, 226–29 (D. Conn. 2025) ("*Guardian v. Aetna*"), *with, e.g., Mod. Orthopaedics of NJ v. Premera Blue Cross*, Case No. 2:25-cv-01087, 2025 WL 3063648, at *3–14 (D.N.J. Nov. 3, 2025).

For the following reasons, the Court concludes that Congress intended the right it created (that IDR awards are "binding" and must be paid within 30 days) to also carry a judicial remedy if the obligated payor does not comply with the IDR award, and thus PHI has a cause of action to enforce the IDR award at issue here.

### A.    Implied private right of action under the No Surprises Act

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). Some statutes provide "an express private judicial right of action." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 188 (2023). Although the absence of an express private right of action generally signals an intent that rights conferred by a statute are not enforceable

through private lawsuits, the absence of an express private right of action does not end the analysis of whether a federal right is enforceable in court. Instead, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286 (citing *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)).

That question turns on the statute's "text and structure." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 286 (2002). Unlike under earlier doctrines that focused on whether a remedy was "necessary to make effective the congressional purpose," *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964), under the current test for whether a statute created an implied private right of action, "[s]tatutory intent . . . is determinative." *Alexander*, 532 U.S. at 286 (citing cases). "Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87. This is a "demanding bar." *Talevski*, 599 U.S. at 180; *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 164 (2008) ("[I]t is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one.") (citing *Alexander*, 532

U.S. at 286–87; *Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1102 (1991); *Touche Ross & Co.,* 442 U.S. at 575).[8]

The first step in analyzing whether Congress intended for statutory rights to be enforceable through a private right of action looks to whether a statute contains "provisions" that "*unambiguously* confer individual federal rights." *Talevski*, 599 U.S. at 180 (citing *Gonzaga*, 536 U.S. at 280) (emphasis in original). The statute must be "rights-creating," *Alexander*, 532 U.S. at 288, in the sense that "its text [is] 'phrased in terms of the persons benefited.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 692 n.13 (1979)).[9] There must be "'an *unmistakable focus* on the

---

[8] One area where courts are "particularly" reluctant to infer implied private rights of actions are statutes "enacted pursuant to Congress's spending power." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 365 (2025); *see also id.* at 369 ("Though it is rare enough for any statute to confer an enforceable right, spending-power statutes like Medicaid are especially unlikely to do so."). That is because Article I, section eight, clause one of the Constitution, which "gives Congress the 'Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States[,]'" "[u]nlike other enumerated powers . . . does not expressly endow Congress with the power to regulate conduct." *Id.* at 370 (quoting U. S. Const., Art. I, § 8, cl. 1). The No Surprises Act was not enacted pursuant to Congress's spending power, and thus the heightened showing that is required for finding that a "spending-power statute[]" has created an "enforceable right," *id.* at 369, does not apply here.

[9] In *Gonzaga* the question was whether a violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, could be enforced through a claim for damages under 42 U.S.C. § 1983. 536 U.S. at 276. "[W]hether a statutory violation may be enforced through § 1983 'is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute.'" *Id.* at 283. That is because "[p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284. But the "inquiries" under § 1983 and on the question of whether a statute created a private right of action "overlap in one meaningful respect—in either case [courts] must first determine whether Congress *intended to create a federal right.*" *Id.* at 283 (emphasis in original).

benefited class.'" *Id.* (quoting *Cannon*, 441 U.S. at 691) (emphasis in original). So the question here is this: When Congress stripped out-of-network emergency services providers of rights to be paid by patients and required providers to pursue payment only through the IDR process, expressly deemed IDR awards "binding" and mandated that those awards be paid within 30 days, did it confer on such providers a "right" to be paid when they obtain an IDR award? The No Surprises Act unambiguously requires that the answer to that question is "yes." "IDR awards under the NSA are binding once they are issued." *Guardian v. Aetna*, 789 F. Supp. 3d at 227. Congress made clear that "[a] determination of a certified IDR entity . . . shall be binding upon the parties involved," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I), and that the determined "payment . . . shall be made," *id.* § 300gg-111(c)(6). These provisions unambiguously are "rights-creating" with an "unmistakable focus," *Gonzaga*, 536 U.S. at 284, on benefiting covered providers that have provided covered services and obtain favorable IDR determinations.

Congress conveyed its intent to confer federal rights on such providers even more clearly than in *Talevski*. The question there was whether certain provisions of the Federal Nursing Home Reform Act "unambiguously conferred federal individual rights." 599 U.S. at 172. One provision required nursing facilities to "protect and promote" residents' "right to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." 42 U.S.C. § 1396r(c)(1)(A)(ii). The other "tells nursing facilities that they 'must not transfer or discharge [a] resident' unless certain enumerated preconditions, including advance notice of such a transfer or discharge, are met." *Talevski*, 599 U.S. at 182 (quoting 42 U.S.C. § 1396r(c)(2)(A)–(B)). The Supreme Court held that those provisions "use clear rights-creating language, speak in terms of the persons benefited,

13

and have an unmistakable focus on the benefited class" and thus "satisfy *Gonzaga's* stringent standard." *Id.* at 186 (cleaned up, citing *Gonzaga*, 536 U.S. at 284, 287, 290). Here, the No Surprises Act expressly and unambiguously entitles providers like PHI to payment, not only mandating that IDR awards *be paid* but that they be paid promptly, within 30 days of issuance.

This conclusion is compelled not only by the No Surprises Act's "text" but also its "structure." *See Gonzaga*, 536 U.S. at 286. As part of "[p]reventing surprise medical bills," 42 U.S.C.A. § 300gg-111, Congress stripped and preempted providers' existing rights to collect payment from the patients they serve. It did so in part by making it unlawful for any "hospital or independent freestanding emergency department" to "bill" or "hold liable" any "participant, beneficiary, or enrollee for a payment amount for such emergency services so furnished that is more than the cost-sharing requirement for such services." 42 U.S.C. § 300gg-131(a)(1); *see also id.* § 300gg-131(a)(2) (same rule, for other "nonparticipating provider[s]"); *id.* § 300gg-135 (similar, specifically for air ambulance services).

Having extinguished such providers' existing rights to payment for services, whether conferred by statute or common law, Congress replaced those rights with a federal right with both procedural and substantive components. The procedural component of that federal right is the right to pursue IDR procedures and, if the provider prevails, to obtain an IDR determination. *See, e.g.*, 42 U.S.C. § 300gg-111(c). The substantive component of the federal right includes the express statutory pronouncement that an IDR determination is "binding" and "shall" be paid within 30 days. 42 U.S.C. §§ 300gg-111(c)(5)(E)(i)(I), (c)(6). "When Congress extinguished the provider's right to seek full compensation from the patient, it created a new statutory

right to compensation from the patient's insurer through a new statutory procedure."
*Gov't Amicus Br.*, 2024 WL 4451970, at *8, ECF No. 17-3 at 17. "Congress specified that a provider is owed a specific amount (as determined by the [certified IDR entity's] 'binding' award), from a specific source (the insurer who participated in the IDR proceeding), by a specific deadline (within 30 days)." *Gov't Amicus Br.*, 2024 WL 4451970, at *8–9, ECF No. 17-3 at 17–18 (citing 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D), (c)(5)(E)(i)(I), (c)(6), 300gg-112(a)(3)(B), (b)(6)). In short, there can be no serious dispute that the No Surprises Act conferred on providers that prevail in an IDR process, a federal right to payment of the IDR-determined amount.

With the No Suprises Act unambiguously "phrased in . . . explicit rights-creating terms," *Gonzaga*, 536 U.S. at 284, the second step in determining whether Congress intended that IDR awards be enforceable in court requires determining whether the statute "displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286. As with determining whether a statute has created a federal right, the "interpretive inquiry" remains focused on "the text and structure of the statute." *Id.* at 286, 288 n.7.

Starting with the text, the No Surprises Act expressly renders IDR awards "binding" and mandates that payors "shall" pay the determined amounts within 30 days. As the Supreme Court has explained in a different context, "[s]tatutory '"shall pay" language' often reflects congressional intent 'to create both a right and a remedy.'" *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (quoting *Bowen v. Mass.*, 487 U.S. 879, 906 (1988)). This is, in other words, "a money-mandating obligation." *Id.* at 301, 328. The statute essentially "say[s] that A shall be liable to B;" and so for that reason, the statute could be understood to have created an "express"

15

right of action. *Key Tronic Corp. v. United States*, 511 U.S. 809, 818 n.11 (1994). But even if understood as falling short of creating an "'*express* creation of a right of action,'" the statute unmistakably goes beyond "merely say[ing] that 'A shall be liable' without revealing *to whom* A is liable." *Id.* (quoting dissent) (emphasis in original). In fact, it not only identifies who shall be liable to whom, but specifies the amount (the amount determined by the certified IDR entity) and even precisely how the payment shall be made ("directly to the nonparticipating provider") and sets a deadline for payment ("not later than 30 days after the date on which such determination is made"). 42 U.S.C. § 300gg-111(c)(6). In the context of the statute as a whole, this clearly conveys a congressional intent and expectation that if a certified IDR entity issues an IDR award that a payor refuses to pay, the prevailing party may enforce its right—specifically, its statutory right to prompt payment of an IDR award—through a private action filed in court. *See also Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 73 (D.D.C. 2002) (reasoning that the term "binding," there in the context of a statute governing pesticides that provided that agency determinations would be "binding," was "understood to mean that an award will be enforceable in court").

These procedural and substantive rights are bilateral: when there is a dispute between a provider and a payor about how much is owed under the No Surprises Act, either party may initiate IDR procedures, and whichever party prevails is entitled for the IDR determination to be "binding" and for payment to be made within 30 days. In the instant case, PHI was the aggrieved party that initiated IDR proceedings and was the prevailing party under the IDR award. Thus, the Court focuses herein on whether PHI has a right to enforce the IDR award. But if Optimum had prevailed and was found to owe less than the amount it paid ($10,458.96), and if PHI had failed to reimburse

16

Optimum the difference within 30 days, Optimum would be the party with a "binding" IDR award in its favor that would be enforceable in court. *See, e.g.*, 45 C.F.R. § 149.510(c)(4)(ix) ("If the offer selected by the certified IDR entity is less than the sum of the initial payment and any cost sharing paid by the participant or beneficiary, the provider, facility, or provider of air ambulance services will be liable to the plan or issuer for the difference. The provider, facility, or provider of air ambulance services must pay the difference directly to the plan or issuer not later than 30 calendar days after the determination by the certified IDR entity.").

Optimum emphasizes, correctly, that "courts 'presum[e] that if a statute does not expressly create a private right of action, one does not exist.'" ECF No. 12-1 at 13 (quoting *Tchrs' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 189 (4th Cir. 2007)). By the same token, however, where Congress *has* unambiguously created rights that the statutory text, structure, and context reveal Congress also intended to be enforceable in court, courts must not ignore that congressional intent. *Talevski*, 599 U.S. at 186.

Courts unquestionably must proceed with "caution" in determining whether Congress impliedly created a private right of action, in part because "[t]he determination of who can seek a remedy has significant consequences for the reach of federal power." *Stoneridge Inv. Partners*, 552 U.S. at 165 (citation omitted). But, if anything, the need to consider the "consequences for the reach of federal power" counsels in favor of concluding that providers like PHI who prevail in an IDR procedure are entitled to judicial enforcement of those awards. Congress determined to protect patients from not only the "surprise" of unexpectedly high bills but also from being involved in drawn-out payment disputes. Hence, the IDR process. Once that process culminates in a "binding" IDR award, Congress made clear there should be no further

obstacle to the provider being paid—and paid promptly. Precisely because Congress has extinguished rights, including under state law, any concern about the "consequences for the reach of federal power," *id.*, militates in favor of ensuring that the federal rights that replaced them are not illusory.

The structure of the section of the No Suprises Act governing the "[e]ffects" of an IDR "determination" further confirms that Congress intended for IDR awards to be enforceable in court. It reads as follows:

> A determination of a certified IDR entity under subparagraph (A)--
>
> (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
>
> (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

42 U.S.C. § 300gg-111(c)(5)(E)(i). As explained above, the "shall be binding" language itself clearly is rights-creating, particularly in conjunction with the mandate that such payment "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* § 300gg-111(c)(6). But the significance of that language from an implied-private-right-of-action perspective goes beyond its plain text.

When Congress described an IDR award as "binding upon the parties involved" in the absence of fraud, it simultaneously made clear that the only grounds on which an IDR award is subject to judicial "review" are those identified in "paragraphs (1) through (4) of section 10(a) of Title 9" (§ 300gg-111(c)(5)(E)(i)(II)), such as "fraud," "corruption"

"partiality," or a "refus[al] to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(1)–(4). Given that Congress decreed that IDR determinations are "binding upon the parties involved" and severely limited the circumstances in which an IDR determination is *not* "binding," the "Effects of determination" section clearly conveys an expectation that in the absence of "a fraudulent claim or evidence of misrepresentation" (or corruption, partiality, etc.) a provider with a favorable IDR determination who is not paid within the timeframe required by the Act may enforce its rights in court. Or as the federal government has put it, "[t]o give meaningful effect to Congress's limitation on the circumstances in which an IDR award can be *disturbed*, it is necessary to recognize that Congress intended parties to be able to seek judicial *enforcement*." *Gov't Amicus Br.*, 2024 WL 4451970, at *12 (emphasis in original); ECF No. 17-3 at 21.

Some courts have reasoned (and Optimum argues here) that when Congress in this subsection stated that an IDR determination "shall not be subject to judicial review," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II), that meant Congress was also precluding a court action to *enforce or confirm* an IDR determination. *See, e.g.*, *Guardian v. HCSC*, 140 F.4th at 275; *Mod. Orthopaedics*, 2025 WL 3063648, at *12. But that is a non-sequitur. The ordinary meaning of the phrase "judicial *review*" refers to attempts by a non-prevailing party to seek "review" of, *i.e.* to challenge, a decision. That is the meaning of the phrase judicial "review" under the Administrative Procedures Act. 5 U.S.C. § 706(2) (in defining the "[s]cope of review" requiring that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," for example, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). Judicial review under the APA has its limits, of course, the "basic contours"

of which "the APA delineates." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). And when it came to the No Surprises Act, Congress made clear that on the question of the correctness of an IDR determination, a non-prevailing party is not entitled to a do-over in federal court; far from it. Congress imposed severe limits on the grounds on which a non-prevailing party may seek to vacate an IDR determination. But the point here is that when Congress limited the grounds on which a court could engage in "judicial review" it was speaking to the limits on a court's authority when a party has *challenged* an IDR determination, not to whether courts have authority to *enforce* an IDR award where a non-prevailing party refuses to pay. Although, as the Fifth Circuit observed, sometimes courts and Congress use the term "judicial review" to "include actions that seek to confirm or enforce a dispute resolution award," *Guardian v. HCSC*, 140 F.4th at 275–76, this Court concludes that the text and structure of the No Surprises Act reflects that Congress intended the phrase "judicial review" in this context to refer to lawsuits brought to challenge an IDR award, not to enforce or confirm one.

Relatedly, some courts have focused on the fact (and Optimum argues here) that within the no-"judicial review" provision, Congress referred to the limited grounds for *vacating* IDR determinations, by cross-referencing § 10(a) of the FAA, without separately incorporating FAA § 9, which governs "confirmation" of arbitration awards. *See, e.g.*, *Guardian v. HCSC*, 140 F.4th at 276; *Mod. Orthopaedics*, 2025 WL 3063648, at *5. But as a matter of statutory interpretation—which is the lodestar in this context— that reasoning breaks down on multiple levels. Perhaps the most fundamental is that there would have been no reason for the Act to incorporate the FAA's "confirmation" procedure under § 9 because the No Surprises Act itself renders an IDR award "binding upon the parties involved." In a typical FAA § 9 scenario, a private party that has

prevailed through a private arbitration pursuant to a contract between private parties brings an action to convert that private award into an enforceable judgment. In that private arbitration context, an arbitration award lacks a statutory basis for enforcement until a confirmation proceeding is filed pursuant to FAA § 9. But under the structure enacted pursuant to the No Surprises Act, "confirmation" pursuant to the FAA is not necessary (or even relevant) because the Act itself establishes that an IDR determination is "binding" and that payment "shall be made . . . not later than 30 days after the date on which such determination is made." 42 U.S.C. § 300gg-111(c)(6).

If anything, the fact that Congress relied on § 10 of the FAA to articulate the (limited) grounds on which an IDR determination can be challenged confirms that Congress considered itself to have rendered IDR determinations not only "binding" but subject to judicial enforcement in the event a liable party fails or refuses to pay. After all, Congress understood the IDR process to be akin to arbitration and IDR awards as akin to arbitration awards. *See, e.g.*, 42 U.S.C. § 300gg-111(c) (describing the "independent dispute resolution process" for "[d]etermination of out-of-network rates to be paid by health plans"); H.R. Rep. No. 116-615, pt. 1, at 56–57 (describing the "IDR process, also referred to an arbitration," and specifically a "'baseball-style' arbitration, under which each side submits a price, and  the arbitrator chooses one, with both sides bound by the decision," as the procedure adopted in the No Surprises Act). In other words, "[w]hile Congress did not incorporate the FAA in its entirety into the NSA, the statute's express reliance on the FAA's provisions regarding judicial vacatur of an arbitration award in limited circumstances suggests that Congress expected these determinations to be judicially enforceable in all other circumstances." *Gov't Amicus Br.*, 2024 WL 4451970, at *11–12.

21

Finally, some courts have pointed out that the No Surprises Act authorizes HHS to impose civil monetary *penalties* on "a group health plan and any health insurance issuer that fails to meet a provision of this part or part D (other than section 300gg-121 of this title) applicable to such plan or issuer." 42 U.S.C. § 300gg-22(b)(2)(A); *see also* 45 C.F.R. § 150.301 ("General rule regarding the imposition of civil money penalties" under the Public Health Service Act); *see, e.g.*, *Guardian v. HCSC*, 140 F.4th at 277 (finding significant that Congress "empowered HHS to assess penalties against insurers for failure to comply with the NSA"); *Mod. Orthopaedics*, 2025 WL 3063648, at *9 (concluding that HHS penalties constitute a sufficiently "robust system of administrative enforcement" to mean federal courts "ha[ve] no jurisdiction to confirm" IDR awards). But those penalty provisions "do not empower agencies to enforce individual IDR awards or to hold health plans and insurers accountable for untimely payments." *Guardian v. Aetna*, 789 F. Supp. 3d at 229. Moreover, such penalties not only would be payable to the government (not providers) but also have no nexus to the amount of any given IDR award. *See, e.g.*, 42 U.S.C.A. § 300gg-22(b)(2)(C) (setting penalties up to "$100 for each day for each individual with respect to which such a failure occurs").[10] Nothing in the No Surprises Act authorizes HHS (or DOL or Treasury or any state agency for that matter) to order a payor that is in violation of the Act to comply with an IDR determination. As the federal government, on behalf of the very

---

[10] These points render distinguishable *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107 (2024), which Optimum cites, *see* ECF No. 19 at 12. The statute there (the Families First Coronavirus Response Act) did authorize direct agency enforcement. Pub. L. No. 116-127, 134 Stat. 178 (2020), § 6001(b) ("ENFORCEMENT.—The provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury to group health plans and health insurance issuers offering group or individual health insurance coverage. . . .").

agency (HHS) that Optimum contends has exclusive enforcement authority, has explained, "[t]he imposition of civil monetary penalties may indirectly encourage payment, but it would not be comprehensive, and it would not necessarily result in the provider compensation contemplated by Congress when it enacted the NSA." *Gov't Amicus Br.*, 2024 WL 4451970, at *13; ECF No. 17-3 at 22. The existence of a "'comprehensive enforcement scheme'" that is "'incompatible with individual enforcement'" can indicate the lack of a congressional intent to permit private rights of action. *Gonzaga*, 536 U.S. at 284 n.4 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). But here HHS does not have any statutory authority to "enforce" an IDR award; the limited availability of civil monetary penalties under the No Surprises Act is not an "enforcement scheme," let alone one that is "comprehensive."

For these reasons, this Court concludes that the only way to reasonably construe the No Surprises Act consistent with its "text and structure," *Gonzaga*, 536 U.S. at 284, is to conclude that Congress intended that a "binding" IDR determination, if unpaid after 30 days, may be enforced through a private right of action and thereby converted into a judgment. Thus, this Court agrees with the views of the federal government, *Gov't Amicus Br.*, 2024 WL 4451970, at *7–16; ECF No. 17-3 at 16–25, and the district courts in *Guardian v. Aetna*, 789 F. Supp. 3d at 225–29, and *GPS of N.J. M.D., P.C. v. Horizon Blue Cross & Blue Shield*, the latter of which also agreed that the NSA "gives the court the authority" to "confirm" an IDR award and "compel compliance." Case No. 22-cv-

6614, 2023 WL 5815821, at *10 (D.N.J. Sept. 8, 2023).[11] PHI has amply satisfied the "demanding bar" for finding congressional intent to have impliedly created a private right of action. *Talevski*, 599 U.S. at 180. It is inconceivable (to this Court, at least) that when Congress extinguished a panoply of providers' private rights, erected a carefully reticulated dispute mechanism, and decreed that final determinations issued through that procedure would be "binding" and "shall" be promptly paid, it considered itself to be leaving prevailing parties with no way to enforce those rights. The clear text and structure of the No Surprises Act entitles prevailing parties to judicial enforcement of IDR awards.

One final point that has pertinence to this case, perhaps less to other mine-run disputes under the No Surprises Act. As noted above, Optimum complains that the IDR entity erred when it "incorrectly stated (in the award) that Optimum failed to submit any offer, and accepted PHI's as the only offer presented." ECF No. 19 at 7 n.2. And it states it has filed a "complaint" with HHS about that issue. *Id.* It appears Optimum may be correct that the IDR entity here made an error (though as noted above that issue is not ripe, because at the pleadings stage this Court must decide Optimum's motion to

---

[11] Optimum urges this Court not to follow *GPS of N.J.* in part because there, unlike here, the provider had filed a motion to *vacate* the IDR award. ECF No. 19 at 15; *see GPS of N.J.*, 2023 WL 5815821, at *1. Because the NSA undisputedly expressly authorizes parties to seek vacatur of an IDR award, Optimum argues, it was perhaps unsurprising that the insurer there did not dispute the court's authority, if it did not vacate the award, to "confirm" the award. *Id.* Because there was no dispute over whether the court had that authority, the *GPS of N.J.* court did not *hold* that the No Surprises Act would have authorized an enforcement proceeding if one of the parties had not sought to vacate the award. But considering that case in the context of the plain language of the NSA and the implied-private-right-of-action test under *Alexander*, the *GPS of N.J.* court's reasoning further illustrates why the Act impliedly authorizes parties to enforce IDR determinations in court.

dismiss based on PHI's complaint, *see* n.6, *supra*). Perhaps that error even rises to the level of a "refus[al] to hear evidence pertinent and material to the controversy," which is one of the grounds on which an aggrieved party may seek an order vacating an IDR award. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); 9 U.S.C. § 10(a)(3). So, Optimum may very well have had grounds to seek "judicial review" of the IDR determination here. But Optimum has neither filed a vacatur action nor filed a motion to vacate in response to PHI's enforcement action in this case. The IDR entity's alleged error does not entitle Optimum to simply disregard Congress's mandate that the IDR determination is "binding" and that payment was due 30 days after the IDR determination was issued.[12]

For these reasons, the No Surprises Act impliedly authorizes a very narrow private right of action to convert a "binding" IDR determination to a judgment if the obligated party does not comply with its statutory payment obligation.

### B.      Confirmation of the Award under the Federal Arbitration Act

PHI has also argued that even if the No Surprises Act *itself* does not authorize judicial enforcement of IDR awards, the FAA independently authorizes judicial enforcement, through an action to "confirm" the award under 9 U.S.C. § 9. ECF No. 4 ¶¶ 15–19. If that is correct, then regardless of whether an implied private right of action exists under the No Surprises Act, PHI would have a cause of action (via FAA § 9), and could file it in federal court so long as there an "independent jurisdictional basis" for federal subject matter jurisdiction, *Badgerow v. Walters*, 596 U.S. 1, 9 (2022).

---

[12] Also, Optimum refers to the internal HHS complaint as an "appeal[] to the administrative agency tasked with enforcement." ECF No. 19 at 7 n.2. It is not an "appeal." Congress did not authorize any "appeal" from an IDR determination; rather, it limited parties with disputes about IDR determinations to seek judicial orders vacating such determinations. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II).

As explained above, the text, structure, and context of the No Surprises Act demonstrate a clear intent to have authorized judicial enforcement of IDR determinations upon a violation of a party's statutory obligation to pay. Congress may very well have envisioned that the procedural mechanism for judicial confirmation of an IDR determination would be through an action pursuant to FAA § 9. As explained above, the No Surprises Act does evince that Congress understood IDR awards to be akin to arbitration awards. But this Court need not decide whether FAA § 9 separately authorizes PHI's action to enforce the IDR award because the action is independently authorized by the No Surprises Act itself.

## IV.    CONCLUSION

For the reasons explained above, Plaintiff has stated claims on which relief can be granted, and thus Defendant's motion to dismiss (ECF No. 12) will be denied; Defendant's motions for leave to file supplemental authorities (ECF Nos. 20, 23, 37, 42, 43) will be granted. A separate order follows.


Date: March 27, 2026

_____*/s/*_____
Adam B. Abelson
United States District Judge

26